IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Muncy Valley Hospital, : 
                Petitioner : 
     : 
     : 
    v. : No. 730 C.D. 2019
     : SUBMITTED: May 12, 2020
Unemployment Compensation Board : 
of Review, : 
                Respondent : 

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                         FILED: June 10, 2020

Muncy Valley Hospital (Employer) petitions for review of the June 7, 2019 Order of the Unemployment Compensation Board of Review (Board) reversing the decision of a Referee to deny Lora J. Malloy (Claimant) unemployment compensation (UC) benefits. The Board concluded that Claimant was eligible for UC benefits because Employer failed to prove that she was discharged for willful misconduct under Section 402(e) of the Unemployment Compensation Law (Law).[1] Because we conclude that the Board erred in determining that Claimant did not commit willful misconduct, we reverse the Board's Order.

## Background

Claimant worked as a part-time certified nursing assistant in Employer's skilled nursing unit from August 8, 2016 through September 30, 2018. Bd.'s Finding

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e). Section 402(e) of the Law states that an employee shall be ineligible for UC benefits for any week "[i]n which [her] unemployment is due to [her] discharge or temporary suspension from work for willful misconduct connected with [her] work." 43 P.S. § 802(e).

of Fact (F.F.) No. 1; Notes of Testimony (N.T.), 1/24/19, Ex. ER-6. Employer has a policy, of which Claimant was or should have been aware, prohibiting the physical abuse of residents, which is defined as infliction of pain, impairment, unreasonable confinement, or any punishment that would result in harm. Bd.'s F.F. No. 2; N.T., 1/24/19, Ex. ER-1.[2] Examples of physical abuse include slapping and hitting. Bd.'s F.F. No. 2; N.T., 1/24/19, Ex. ER-1. Employer also has a Code of Conduct that prohibits employees from engaging in certain unacceptable behaviors, including making inappropriate advances toward and/or physical contact with others. Bd.'s

---

[2] Employer's abuse policy provides in relevant part:

Each resident has the right to be free from *all types of abuse*. . . .

Resident abuse is defined *as any act of* omission or *commission which may cause or does cause actual physical, psychological, or emotional harm or injury to a resident,* or any act which willfully deprives a resident of his right by law, regulation[,] or as stated herein.

Abuse includes verbal, sexual, physical, mental, neglect and exploitation as well as abuse facilitated or enabled through the use of technology. Willful, as used in this definition of abuse, means the individual must have acted deliberately, not that the individual must have intended to inflict injury or harm.

N.T., 1/24/19, Ex. ER-1 (emphasis added). "Physical abuse" is defined as follows:

**Physical Abuse:** Infliction of injury, pain, impairment, unreasonable confinement or punishment with resulting harm.

*Examples[] [m]ay be, but not limited to:* slapping, tripping, shaking, restraints, pushing, hitting, rough handling, grabbing, pulling hair, pinching, shoving, biting, punching, improper use of restraints or medications, kicking, scratching, too hot/too cold water or force feeding.

*Id.* (emphasis added).

F.F. No. 2; N.T., 1/24/19, Ex. ER-2.[3]    Under its corrective discipline policy, Employer may immediately discharge an employee for threatening, abusing, or harming another person.  Bd.'s F.F. No. 2; N.T., 1/24/19, Ex. ER-3.

On September 30, 2018, Claimant was providing bedtime care to an elderly dementia resident at Employer's skilled nursing facility.  Bd.'s F.F. No. 3; N.T., 1/24/19, Ex. ER-5.[4]  The resident became combative, dug her nails into Claimant's arm, drew blood from Claimant, and spit in Claimant's face.  Bd.'s F.F. No. 3. Although this specific finding is disputed on appeal, the Board found that Claimant reacted by using the back of her hand to "tap" the resident in the mouth.  *Id.*  Claimant was shocked at her reaction and did not think before doing it.  *Id.*  The resident was not impaired or injured as a result of the incident.  *Id.* No. 4.  Following this incident, Employer discharged Claimant for violating its abuse policy and its Code of Conduct.  *Id.* No. 5; N.T., 1/24/19, at 5.

---

[3] Employer's Code of Conduct states in relevant part:

We value the patient-caregiver relationship by demonstrating our accountability for patient safety and *by safeguarding patient trust, particularly for our most vulnerable patients, especially those within the pediatric, geriatric and disabled populations.*

. . . .

[Employer] will not tolerate physically or emotionally intimidating, disruptive, unprofessional, inappropriate, or unethical behavior from people who represent or provide services on behalf of [Employer].  *Examples of unacceptable behaviors include, but are not limited to . . . [m]aking inappropriate advances toward and/or physical contact with others . . . .*

N.T., 1/24/19, Ex. ER-2 (emphasis added).

[4] The record shows that the dementia resident was 91 years old at that time.  N.T., 1/24/19, Ex. ER-7.

3

Claimant filed a claim for UC benefits, which the local UC Service Center denied. The Service Center found that Claimant was discharged for violating a work rule, Claimant was or should have been aware of the rule, and Claimant violated the rule "because[] she reacted without thinking." Not. of Determination, 10/23/18, at 1. The Service Center also found that Claimant did not establish good cause for violating the work rule. *Id.* Therefore, the Service Center determined that Claimant was ineligible for UC benefits under Section 402(e) of the Law. *Id.*

Claimant appealed to the Referee, who held a hearing on January 24, 2019. At the hearing, Employer's Assistant Director of Nursing, Crystal Kimble, testified that Claimant was terminated for resident abuse because, on September 30, 2018, Claimant "struck a . . . dementia resident in the face with the back of her hand." N.T., 1/24/19, at 3. Ms. Kimble testified that "[t]here was another nurse aide present . . . who witnessed it and stepped in at that time to protect the resident." *Id.* at 4.

Ms. Kimble testified that Claimant's conduct was a violation of several of Employer's policies, including its policy prohibiting the physical abuse of residents. *Id.* at 4-5. Ms. Kimble explained, "We work under the [Commonwealth of Pennsylvania] Department of Health regulations, and they describe resident abuse as striking or causing harm to any resident." *Id.* at 3. Ms. Kimble further testified that Claimant's act of "slapping a resident" was also a violation of Employer's Code of Conduct, which prohibits employees from "[m]aking inappropriate advances [toward] and/or physical contact with others." *Id.* at 5. Ms. Kimble testified that as part of Claimant's training to become a certified nursing assistant, Claimant was informed that striking a resident is prohibited. *Id.*

Ms. Kimble further testified that as a result of Claimant's conduct, Employer "ha[d] to call this [resident's] family member, who is a prominent person in our

small community, and tell him that[] while his mother was in our trusted care[,] she was abused." *Id.* at 7. Employer also "had to spend time and resources notifying the [Commonwealth of Pennsylvania] Department of Health, and [the] local area Office of Aging, as well the State Office of Aging" of the incident. *Id.*

Employer entered into evidence several documents, including its abuse policy, its Code of Conduct, its corrective discipline policy, a document signed by Claimant acknowledging her receipt and understanding of Employer's policies, and Claimant's written statement regarding the incident. *See id.* at 4-9.

Claimant testified that on the night in question, she was called into the resident's room to assist a nurse aide in providing bedtime care to the resident. *Id.* at 16. However, "[she] let the aide know prior to that, that [she] did not want to be involved in [the resident's] care. . . [b]ecause the resident at that period of time seemed to become very agitated when she was around [Claimant]" and "[t]his had been going on for several weeks." *Id.* Claimant explained:

> When [the resident] needed direct care, my other co[-]worker that I typically worked with . . . would take care of her, rather than me doing it.
>
> . . . .
>
> Because the resident seemed to be agitated, and specifically when I was near her, so I do not know why – what she thought, but I just felt that it was better to let somebody else handle [the resident] directly rather than me. So, it was to keep [the resident] from becoming more agitated.

*Id.*

Claimant then testified as to what transpired after she entered the resident's room, as follows:

> When I came in[to] the room, the resident was very angry and screaming, get out, just get out. I don't need your help. The other

5

[nurse] aide was standing against the sink.  So, I tried to talk to the resident and tell her calmly, that we were just going to help her and get her ready for bed.

*Id.* at 17.  While the resident was sitting on the toilet, Claimant attempted to put a gait belt[5] on the resident.  *Id.* at 18.  Claimant testified:

> As I was putting the gait belt around [the resident], trying to avoid her hitting me, when I had the gait belt behind her, I dropped the buckle end of it, and it smacked against the toilet.  I reached out to grab it, and again, I can't say what she was thinking, but it appeared as if the noise and or my sudden movement created more of a situation for her.  She became much more combative.
>
> . . . .
>
> She was digging into my arm with her fingernails.  She did draw blood on my arm, which was not the first time she's done that, and at the point where she spit on me, it was a reaction on my part.  She spit on me, and *I don't know why I did it, but I reached up on and tapped her on the mouth.*

*Id.* at 19 (emphasis added).  Claimant then used her hand to demonstrate to the Referee her physical contact with the resident's face, stating, "*I . . . just tapped her on the mouth, not hard, and I told her, that that was not appropriate, and that we didn't do things like that.*"  *Id.* (emphasis added).  The following exchange then occurred:

> [Claimant's Counsel:] So . . . *we used the words here today, hit, strike, smack, tap.  What you just demonstrated here, is that pretty accurate as to what happened?*
>
> [Claimant:] *Yes.*

---

[5] According to Employer, a gait belt is "a device used to assist with mobility."  Employer's Br. at 11.

[Claimant's Counsel:] I mean would you . . . say that was a reaction? When did you kind of realize it happened? Was there any thought beforehand . . . ?
[Claimant:] None at all. . . . It was never my intention.

*Id.* at 20 (emphasis added); *see id.* at 24-25 (wherein Claimant again used her hand to demonstrate to the Referee her physical contact with the resident's face). After the incident, Claimant and the aide finished getting the resident ready for bed, after which Claimant "walked out of the room[] and . . . went right over to the nurse [on duty] and told her" what happened. *Id.* at 20.

Claimant testified that while she was in the resident's room, before the incident, "I was upset that I had to be in there, because I didn't want to be" and "I had told the aide prior, at the beginning of the shift[,] that I did not want to take care of [the resident]." *Id.* at 18. Despite what occurred that night, Claimant testified that she liked the resident and had always treated her with care and respect. *Id.* at 21. Claimant also testified that she had never previously been disciplined for mistreating a resident and that Ms. Kimble "had . . . said to me on [prior] occasions that I was good to my residents." *Id.* at 22.

Following the hearing, the Referee affirmed the Service Center's denial of UC benefits, concluding that Employer proved that Claimant was discharged for willful misconduct under Section 402(e) of the Law. Ref.'s Order, 1/28/19, at 3. In reaching her decision, the Referee made the following pertinent factual findings:

6. On August 9, 2018, [C]laimant signed an acknowledgement of her understanding of [Employer's] abuse/neglect policy and the types of abuse/neglect described in the policy.

7. [C]laimant was also trained on the definitions and given examples of abuse/neglect during her [certified nursing assistant] training/certification provided by the [Commonwealth of Pennsylvania] Department of Education.

7

8. [While C]laimant was providing bedtime care to a resident diagnosed with dementia, the resident became combative and spit in [C]laimant's face.

9. *[C]laimant responded by using the backside of her hand to strike the resident on her mouth.*

Ref.'s F.F. Nos. 6-9 (emphasis added).

Claimant appealed to the Board, which reversed the Referee's decision. Contrary to the Referee's finding that Claimant struck the resident's mouth, the Board found that "Claimant . . . us[ed] the back of her hand to *tap the resident in the mouth*." Bd.'s F.F. No. 3 (emphasis added). The Board concluded as follows:

> [Alt]hough [E]mployer established [that] resident abuse is prohibited, *[E]mployer has not proven that [C]laimant intentionally committed misconduct.* A resident became combative, dug her nails into [C]laimant's arm, drew blood from [C]laimant, and spit in [C]laimant's face. *[C]laimant reacted by using the back of her hand to tap the resident in the mouth.* [C]laimant was shocked at her own reaction. [C]laimant did not think beforehand and it was never [C]laimant's intention [sic].
>
> Willful misconduct requires the conduct to be that: willful. [C]laimant testified credibly that she reacted, she did not think beforehand, and did not intend to do what she did. Furthermore, the resident was not injured. *When [C]laimant was physically assaulted by the resident, [C]laimant reacted instinctively. This significantly reduces her culpability.*
>
> While the Board in no way questions [E]mployer's right to discharge [C]laimant, it did not prove [that] she committed willful misconduct. There is a critical distinction between [E]mployer's right to terminate employment and the state's right to deny [UC] benefits.

Bd.'s Order, 6/7/19, at 3-4 (emphasis added).[6]  Therefore, the Board concluded that Claimant was not disqualified from receiving UC benefits under Section 402(e) of the Law.  Employer now petitions this Court for review.[7]

## Analysis

On appeal, Employer asserts that the Board erred in concluding that Employer failed to prove that Claimant committed willful misconduct.  First, Employer contends that the Board's finding that Claimant "tapped" the resident on the mouth is unsupported by substantial evidence.  Second, Employer argues that the Board erred in concluding that Claimant did not deliberately violate Employer's policies because she reacted instinctively and did not intend to strike the resident in the mouth.  Third, Employer contends that, even in the absence of Employer's policies, the evidence established that Claimant's conduct constituted a disregard of the standards of behavior that Employer had the right to expect of its employees.

### 1. Work Rule Violation

Our Court has defined "willful misconduct" as a wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rules, a disregard of the standards of behavior that the employer has a right to expect of its employees, or negligence indicating an intentional disregard of the employer's interests or of the employee's duties and obligations.  *Miller v. Unemployment Comp. Bd. of Review*,

---

[6] On February 20, 2019, Employer submitted a letter to the Board challenging the timeliness of Claimant's appeal to the Board.  On March 11, 2019, the Board issued an Order remanding the matter to the Referee for a supplemental hearing limited to the issue of timeliness.  Following the remand hearing, the Board determined that Claimant's appeal was, in fact, timely filed.  Bd.'s Order, 6/7/19, at 3.

[7] Our scope of review is limited to determining whether the necessary factual findings are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated.  Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

83 A.3d 484, 486-87 (Pa. Cmwlth. 2014). An employer seeking to prove that a claimant committed willful misconduct by violating a work policy "must demonstrate the existence of the policy, its reasonableness, and its violation." *Klampfer v. Unemployment Comp. Bd. of Review*, 182 A.3d 495, 500 (Pa. Cmwlth. 2018). The employer must also show that the employee deliberately violated the employer's policy. *Tongel v. Unemployment Compensation Board of Review*, 501 A.2d 716, 717 (Pa. Cmwlth. 1985). If the employer satisfies its burden of proof, then "the burden shifts to the claimant to demonstrate good cause for violating the [policy]." *Chester Cmty. Charter Sch. v. Unemployment Comp. Bd. of Review*, 138 A.3d 50, 54 (Pa. Cmwlth. 2016).

Employer first argues that the Board's finding that Claimant merely "tapped" the resident's mouth was unsupported by substantial evidence, because Claimant provided multiple written statements before the Referee's hearing indicating that she had used a greater level of force. In her written statement provided to Employer shortly after the incident, Claimant described her action toward the resident as follows:

> [The r]esident had an immediate reaction toward[] me and started yelling and pinching. She then spit in my face. *Unfortunately, my immediate reaction was that I smacked my fingers against her lips and told her to stop. I did not hit her hard, but the fact remains that I did strike her.*

N.T., 1/24/19, Ex. ER-7 (emphasis added). At the hearing, Claimant testified that she typed this incident report herself. N.T., 1/24/19, at 15.

On her Internet Initial Claims Form submitted to the Department of Labor and Industry, Claimant stated: "When the resident spit in my face, *my immediate reaction was to smack her mouth and tell her the behavior isn't acceptable*. I

10

immediately regretted my reaction, however, I couldn't undo what I did." Record (R.) Item No. 2 (emphasis added). Notably, it was not until the hearing before the Referee that Claimant first stated that she "tapped" the resident on the mouth. *See* N.T., 1/24/19, at 19-20. Claimant admitted on the record that that was the first time she had used the word "tap" to describe her conduct. *Id.* at 24.

Claimant's prior descriptions of the incident were also documented by Employer on its Corrective Action Discipline Authorization Form completed at the time of Claimant's termination, which stated:

> Part of a [certified nursing assistant's] role is to demonstrate our core values, including treating others (employees, patients, residents, guests and visitors) with [d]ignity and [r]espect. In addition, [Employer's abuse] policy dictates that all residents are protected from and not subject to abuse of any kind.
>
> On 09/30/2018, [Claimant] was caring for a dementia resident. The resident was being combative and spit on [Claimant]. *[Claimant] responded by hitting her in the face with the back of her hand.* [A nurse aide] was in the room and stepped between [Claimant] and [the] resident. *[The nurse aide] confirmed that she witnessed [Claimant] hit the resident with the back of her hand. [Claimant] also admitted to striking the resident. . . .*
>
> *Based upon the witness observations and the admissions of [Claimant] about her treatment of the patient*, [Claimant's] employment is being involuntarily separated.

N.T., 1/24/19, Ex. ER-6 (emphasis added); *see id.*, Ex. ER-7.

Despite all of the documentary evidence indicating that Claimant smacked, struck, or hit the resident, which met the definition of physical abuse under Employer's policy, *see* N.T., 1/24/19, Ex. ER-1, the Board instead credited Claimant's testimony at the hearing that she "us[ed] the back of her hand to tap the resident in the mouth." Bd.'s F.F. No. 3; N.T., 1/24/19, at 20, 24-25. While we

11

recognize that the Board is the ultimate factfinder in UC cases, it is well settled that the Board's findings "are conclusive on appeal *only* if they are supported by *substantial evidence from the record as a whole.*" *Lee Hosp. v. Unemployment Comp. Bd. of Review*, 589 A.2d 297, 299 (Pa. Cmwlth. 1991) (emphasis added); *see Henderson v. Unemployment Comp. Bd. of Review*, 77 A.3d 699, 718 (Pa. Cmwlth. 2013). "Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Guthrie v. Unemployment Comp. Bd. of Review*, 738 A.2d 518, 521 (Pa. Cmwlth. 1999).

Here, Claimant's description of the incident as a "tap" at the hearing conflicted with each of her prior written statements made closer in time to the incident, wherein she acknowledged that she "smacked" the resident, "hit" the resident, and "did strike her." *See* N.T., 1/24/19, Exs. ER-6 & ER-7; R. Item No. 2. In light of the overwhelming pre-hearing evidence that Claimant used a level of force stronger than a "tap," we can reasonably infer that her characterization at the hearing was an attempt to downplay her actual behavior.

Given the discrepancy between Claimant's multiple written statements provided closer in time to the incident and her subsequent testimony, we conclude that the record, *as a whole*, does not contain substantial evidence to support the Board's finding that Claimant merely "tapped" the dementia resident's mouth. However, regardless of the level of force Claimant used to make physical contact with the dementia resident – whether a tap, hit, strike, or smack – Claimant's conduct clearly violated Employer's policies. *See* Bd.'s F.F. No. 2; N.T., 1/24/19, Ex. ER-2.

Next, Employer asserts that the Board erred in concluding that Claimant did not deliberately violate Employer's policies. It is undisputed that Employer had a

12

policy prohibiting physical abuse of residents and a Code of Conduct prohibiting inappropriate physical contact with others and that Claimant was aware of these policies. Bd.'s F.F. No. 2; *see* N.T., 1/24/19, Exs. ER-1, ER-2, & ER-4. The only disputed issue is whether Claimant intentionally violated Employer's policies by striking, smacking, or hitting the dementia resident on the mouth with the back of her hand in response to the resident's aggressions. The Board determined that Claimant did not deliberately strike the resident, but merely "reacted instinctively" when physically provoked. The Board therefore concluded that because Claimant reacted instinctively, she did not intentionally violate Employer's policies. We disagree.

Pursuant to Employer's Code of Conduct, employees are required to "value the patient-caregiver relationship *by demonstrating our accountability for patient safety and by safeguarding patient trust, particularly for our most vulnerable patients*, especially those within the pediatric, geriatric and disabled populations." N.T., 1/24/19, Ex. ER-2 (emphasis added). The Code of Conduct also provides that Employer "*will not tolerate*" certain behaviors in the workplace that it deems "unacceptable," including *"[m]aking inappropriate advances toward and/or physical contact with others*." *Id.* (emphasis added); Bd.'s F.F. No. 2. In addition, Employer's abuse policy prohibits the physical abuse of residents, the definition of which expressly includes "slapping" and "hitting." N.T., 1/24/19, Ex. ER-1; Bd.'s F.F. No. 2. Claimant was aware of and understood these policies. N.T., 1/24/19, at 6-7; *id.*, Ex. ER-4; Bd.'s F.F. No. 2.

We find *Wolfe v. Unemployment Compensation Board of Review*, 425 A.2d 1218 (Pa. Cmwlth. 1981), instructive here. In *Wolfe*, this Court upheld the denial of UC benefits on the ground that the claimant had committed willful misconduct by

13

hitting a co-worker in response to provocation. The claimant and her co-worker "had been having difficulties for some time," and when the claimant's co-worker hit the claimant on the side of the head, the claimant "automatically turned and swung and hit her back," which the Board characterized as "immediate retaliation." *Id.* at 1219. On appeal, we rejected the claimant's assertion that she did not commit willful misconduct, stating, "While we recognize [the] claimant's right to defend herself against physical assault, the Board has made no error of law in concluding that *[the] claimant's action was in retaliation for being hit* rather than [in] self-defense." *Id.* (emphasis added). Although *Wolfe* is not directly on point, it demonstrates that, contrary to the Board's contention, the act of hitting a person as an immediate, instinctive reaction to physical provocation can still amount to willful misconduct.

Furthermore, the record shows that after the incident, Claimant went directly to the nurse on duty and reported what she had done. In her written report completed on the night of the incident, Claimant stated that she informed the nurse on duty that she "smacked" and "did strike" the dementia resident. N.T., 1/24/19, Ex. ER-7. Notably, on Claimant's signed acknowledgment of Employer's abuse policy, Claimant "agree[d] to treat each resident with kindness, dignity and respect and [to] *report any instances of abuse/neglect and/or mistreatment of residents to a supervisor in the Skilled Nursing Rehabilitation Center immediately*." *Id.*, ER-4 (emphasis added). Thus, the fact that Claimant immediately reported her behavior to the nurse on duty indicates that she was aware that she had violated Employer's policy, which further supports a finding of willful misconduct. *See MacFarlane v. Unemployment Comp. Bd. of Review*, 317 A.2d 324, 326 (Pa. Cmwlth. 1974) ("In all the[] definitions [of willful misconduct,] there is an element indicating *a consciousness of wrongdoing on the part of the employe[e]*.") (emphasis added).

14

Finally, we conclude that Claimant failed to establish good cause for her conduct. In its appellate brief, the Board contends that Claimant had good cause for striking the combative resident under the circumstances because "it was a reaction and not intentional." Bd.'s Br. at 12 n.5. However, in *Wolfe*, we concluded the claimant did not have good cause for violating the employer's anti-fighting policy, where the claimant retaliated against a co-worker who hit her in the head by immediately hitting her back, noting that the claimant's conduct was "a willing entry into the fray." 425 A.2d at 1219; *see also Mula v. Unemployment Comp. Bd. of Review*, 407 A.2d 477, 477 (Pa. Cmwlth. 1979) ("While we recognize [the claimant's] right to defend himself against physical assault, . . . his action [of throwing a chair at a customer who punched him] was *in retaliation for being hit rather than self-defense* and hence will not excuse his conduct."). Here, Claimant's reaction to being spit on and scratched by a combative resident was even less justifiable. This was not a physical confrontation between two similarly situated co-workers. Rather, Claimant struck an elderly dementia resident in her care who was seated on a toilet and being restrained by Claimant and another nurse aide at the time.

Accordingly, we conclude, based on the evidence of record, that Claimant committed willful misconduct by violating Employer's Code of Conduct and abuse policy, and, therefore, the Board erred in concluding otherwise.

## 2. Disregard of Expected Standards of Behavior

Employer also asserts that even if Claimant had not violated Employer's policies, Claimant's conduct toward the dementia resident demonstrated a disregard

of the standards of behavior that Employer had the right to expect of its employees.[8] We agree.

It is well settled that "[a]n employer need not have an established rule where the behavioral standard is obvious and the employee's conduct is so inimical to the employer's best interests that discharge is a natural result." *Biggs v. Unemployment Comp. Bd. of Review*, 443 A.2d 1204, 1206 n.3 (Pa. Cmwlth. 1982); *see Umedman v. Unemployment Comp. Bd. of Review*, 52 A.3d 558, 562 (Pa. Cmwlth. 2012). Moreover, "a single act may constitute willful misconduct if it is in open disregard of the employer's reasonable expectations." *Roberts v. Unemployment Comp. Bd. of Review*, 436 A.2d 1052, 1053 (Pa. Cmwlth. 1981).

Here, Claimant admitted that she was aware that caring for potentially combative residents would be part of her responsibilities as a certified nursing assistant. N.T., 1/24/19, at 17. Claimant also testified that she had been trained on the importance of maintaining "[a] calm demeanor [her]self" to attempt to calm combative or aggressive residents. *Id.* at 17. When asked about her reaction to the combative dementia resident, Claimant admitted that striking a resident in her care was contrary to the training she had received and was not caring for the resident to the best of her ability. *Id.* at 24. Claimant also admitted that she was never instructed that striking a resident was an acceptable way to diffuse a combative situation and she was "shocked at what [she] did." *Id.* at 19.

We conclude that Claimant's act of hitting or striking an elderly dementia resident in her care – even in response to provocation – was a disregard of the standards of behavior that Employer had the right to expect of its employees. *See Dantzler v. Unemployment Comp. Bd. of Review*, 524 A.2d 529, 531 (Pa. Cmwlth.

---

[8] Although Employer argued this issue before both the Referee and the Board, *see* R. Item No. 20 at 4, the Board did not address it in its decision.

16

1987) (concluding that, even though the claimant's contact with the patient was "initiated with a laudatory purpose," her use of force against the patient was a disregard of standards of behavior that the employer had the right to expect of its employees); *Mula*, 407 A.2d at 477 (holding that "[i]n light of [the claimant's] special position as manager, training in customer relations, and his responsibility to maintain the safe and efficient management of the restaurant, his conduct fell far below that standard which his employer had a right to expect"). Regardless of whether Claimant's act resulted in physical harm to the resident, Claimant's retaliatory response to an agitated resident suffering from dementia was an obvious disregard of Employer's interests. Employer has the right to expect that its employees who provide care to dementia patients will do so without hitting the patients when they act out in some way.

Furthermore, our Court has stated that a "finding of willful misconduct does not hinge on an employee's intent to wrong [her] employer; such a finding may be based on an employee's *conscious indifference to the duty owed [her] employer.*" *Grigsby v. Unemployment Comp. Bd. of Review*, 447 A.2d 705, 707 (Pa. Cmwlth. 1982); *see Umedman*, 52 A.3d at 562-63. By striking an elderly dementia resident who was dependent on Employer and its workers for all aspects of her care, Claimant demonstrated a conscious indifference to the duty she owed to Employer. Claimant's behavior placed not only the resident, but also Employer, at risk. Because of Claimant's conduct, Employer was required to notify the resident's family and to file reports with the state Department of Health, which issued Employer's license to operate its skilled nursing facility, and with the state and local Offices of Aging. N.T., 1/24/19, at 7 & Ex. ER-5.

## **Conclusion**

We conclude, based on the evidence of record, that Employer satisfied its burden of proving that Claimant committed willful misconduct under Section 402(e) of the Law.  Accordingly, we reverse the Board's Order.


_____
ELLEN CEISLER, Judge

18

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Muncy Valley Hospital,   :
     Petitioner  :
          :
  v.       : No. 730 C.D. 2019
          :
Unemployment Compensation Board :
of Review,     :
     Respondent  :

## **O R D E R**

AND NOW, this 10th day of June, 2020, the Order of the Unemployment Compensation Board of Review, dated June 7, 2019, is hereby REVERSED.

_____
ELLEN CEISLER, Judge